UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

STEPHEN J. HALMEKANGAS          *       CIVIL ACTION

VERSUS                          *       NO. 06-3942

STATE FARM FIRE AND             *       SECTION "J"(2)
CASUALTY COMPANY

## ORDER AND REASONS

Before the Court is Defendant Stephen M. Harelson's ("Harelson") and American National Property & Casualty Insurance Company's ("ANPAC") **Motion for Summary Judgment** (Rec. Doc. 106), seeking dismissal of Plaintiff Steven Halmekangas's ("Halmekangas") claims for damages arising from the alleged negligence of Harelson as an agent of Louisiana Insurance Company ("ANPACLA")[1] in failing to procure adequate insurance for Halmekangas's property, which was located in New Orleans prior to its destruction by Hurricane Katrina. ANPAC seeks summary judgment of Halmekangas's claims in its capacity as Harelson's errors and omissions insurer.

## PROCEDURAL HISTORY AND BACKGROUND FACTS

Halmekangas's property was destroyed by the effects of Hurricane Katrina in August/September of 2005. On August 29, 2005, Hurricane Katrina initially struck the city of New Orleans,

---

[1] ANPACLA, Halmekangas's homeowner's insurance carrier, is not to be confused with ANPAC, Harelson's errors and omissions insurance carrier.

flooding the first floor of the property.  Subsequent to the flooding, the property was completely destroyed by fire on September 2, 2005.  Halmekangas filed claims on for the loss of his property with both his flood and homeowners insurers.  The instant suit, filed in this Court on July 25, 2006,  arises from the handling of those claims.

In December of 2004, Halmekangas sought to procure insurance for the property, a residential building located at 2932 Carrollton Avenue in New Orleans, because his insurer at the time (State Farm) was dropping its coverage as of January 1, 2005.  In the process, Halmekangas contacted the Beyer Beason Insurance Agency, and eventually submitted an application for insurance with ANPACLA to the agency.  In turn, the application was routed to Harelson, an ANPACLA agent, who contacted Halmekangas by telephone to verify the information in the signed application.  Harelson claims that he prepared an "Insurance to Value" ("ITV") form based on this telephone conversation, and then forwarded the ITV with the application to ANPACLA for underwriting.  However, Harelson's deposition testimony indicates that the ITV form information was based on his external inspection of the property, at which Halmekangas was not present.  All these events took place before the end of December 2004.  Harelson and ANPACLA's receipt and processing of Halmekangas's application for insurance

are the foundation of the claims at issue in this motion.

According to Harelson, the initial application stated that the market value of the property was $350,000, and specifically requested the following coverages: (A) Dwelling ($342,000); (B) Other Structures ($34,200); (C) Personal Property ($256,500); and (D) Loss of Use ($85,500). Harelson therefore asserts that he procured these amounts of insurance from ANPACLA for Halmekangas. Harelson/ANPAC also claim that the ITV form that accompanied the application described the house as a two story, single family residence with 3400 square feet of living space. The policy as issued by ANPACLA in the above enumerated amounts included a three page declaration sheet that included the amounts of coverage and the description of the property.

To the contrary, Halmekangas claims that the ITV description of the home was erroneous, and that the error caused him to be severely underinsured when the property was destroyed. Specifically, Halmekangas claims that he informed Harelson during the application process that he was completing extensive renovations on the property and described the house as a three story with 5,500 square feet of living space. Halmekangas also alleges that Harelson knew or should have known based on his external inspection that the house was three stories and larger than the alleged 3400 square footage that Harelson claims was on

the application.  Furthermore, Halmekangas alleges that he signed the application, which he claims did not include a description of the property, based on his reliance on Harelson's estimate of the proper coverage limits.

After the policy went into effect in January of 2005, ANPACLA erroneously cancelled the policy based on an incorrect finding that the house was being used as a multi-family dwelling as opposed to a single-family dwelling as it was listed in the application.[2]  The policy was reinstated after Halmekangas explained to Harelson that the property had been a multi-family residence, but was now a single-family dwelling.  In addition, on January 2, 2005, a new declaration increasing the replacement coverage limit was sent to Halmekangas to correct an error in the ITV created by Harelson.[3]

## THE PARTIES ARGUMENTS

Harelson/ANPAC's motion for summary judgment asserts that

---

[2] This finding was based on the underwriters' review of photographs of the property submitted by Harelson that showed several electrical meters on the property, indicating that the property was a multi-family dwelling.  Pl.'s Memo Supp. Summ. J., Ex. E at 105-06.

[3] Specifically, Harelson had omitted from the ITV a sixty square foot open patio, which was noted by the underwriter reviewing the photos of the property.  Pl.'s Memo Supp. Summ. J., Ex. E at 121-22.

Halmekangas's claims are perempted under Louisiana law, and as such should be dismissed.  Specifically, Harelson/ANPAC argue that Halmekangas had actual knowledge of the alleged error in his insurance policy as of January 3, 2005, when the policy and declaration sheet were mailed to Halmekangas by ANPACLA. Furthermore, Harelson/ANPAC assert that Halmekangas also had actual notice of the alleged error when Harelson signed and mailed a second copy of the policy and declaration to Halmekangas a few days after ANPACLA.  As proof, Harelson/ANPAC note that Halmekangas actually produced a copy of the policy and declarations sheer signed by Harelson during discovery in this case.  Furthermore, Harelson/ANPAC argue that Halmekangas admitted in response to interrogatories that he received the policy and declarations sheet on January 1, 2005 and March 22, 2005, and also admitted the same in his deposition.  The relevant deposition colloquy consists of the following:

> Q. Do you recall receiving declaration
> sheets from [ANPACLA] when you first obtained
> your policy from them?
> A. Yes. In fact, 555, I think, is one
> of them.

"555" refers to the Bates label number of a document identified at Mr. Halmekangas's deposition as the declarations.  However, 555 refers only to the first page of the declarations sheet,

which does not include a property description.  Furthermore, the deposition colloquy immediately preceding and subsequent to the above-quoted interchange included multiple statements by Halmekangas indicating that relevant portions of the copies of the declarations sheet and policy that were produced in this litigation were created *after* Hurricane Katrina.  See Def.'s Memo Opp. Summ. J., Ex. 1 at 73-82.[4]

---

[4] Specifically, counsel for Harelson/ANPAC asked Halmekangas if he had received the declarations sheet, which consisted in pertinent part of a deposition exhibit Bates labeled from 555-559, prior to the hurricane, Halmekangas replied that the only sheets he could say for sure that he had received prior to the storm were the ones that included his handwritten notes:

> Q. Did you receive this document, pages 555, 556, 557, 558 prior to the hurricane?
> A. The only documents I could say I received prior to the hurricane with
> certainty are the ones I wrote on myself, which is on the dec page.

Def.'s Memo Opp. Summ. J., Ex. 1 at 77.

Counsel for Harelson/ANPAC continued to press Halmekangas for an admission that he had received prior to the storm not only the initial page of the declarations sheet, which does not contain the allegedly erroneous property description, but also the subsequent pages of the declarations sheet that did contain the description:

> Q. And the first page of this three-page document has your writing on it; correct?
> A. Yes. And --
> Q. Well, I'm just asking about this document.
> A. Yes.
> Q. Let's not get ahead of ourselves. So the document is a three-page document, 555 through 558; is that

In addition, Harelson/ANPAC allege that *five more declarations sheets* were mailed to Halmekangas by ANPACLA after

---

>   correct?
>   A. Well, actually, it's four pages.
>   Q. It may have even been more than that.
>   A. It's numbered as three pages, but, in fact, there were four.
>   Q. And there's also some other --document 559 is dated 1/1/2005. It says, "Page 3 of the declarations;" is that
>    correct?
>   A. Yes.
>   Q. 560, dated 1/3/2005, "Consumer notes to policyholder;" is that correct?
>   A. Yes.
>   Q. And 561 appears to be part of that mailing; is that correct?
>   . . .
>   Q. 560 and 561 appear to be part of the same document; is that correct?
>   A. On what basis? I mean, I don't know.
>   Q. Well, it says page 1 and 2 on the bottom?
>   A. Yes, it says "P-1" and then "P-2."
>   **Q. I want to know whether you received documents 555 through 561 before the loss in this case, before the hurricane?**
>   **A. The only documents I can say that I received are the ones I wrote on. Because after the storm, I called [ANPACLA] right away; and I made notes on the documents I had.**

Def.'s Memo Opp. Summ. J., Ex. 1 at 78-79.  The allegedly erroneous property description at the crux of this case appears on the declarations page, Bates labeled 558 in the deposition exhibit used at Halmekangas's deposition.  See Def.'s Reply Memo Supp. Summ. J., Ex. 17.  The above quoted colloquy includes what might be construed as an admission by Halmekangas that he did in fact have the declarations sheet including the property description prior to Hurricane Katrina.  However, the equivocal language in bold at the end of this colloquy sheds doubt on whether Halmekangas had the description as of January 5, 2005.

the January mailings, along with duplicate copies from Harelson, all more than one year before he filed suit.[5] Besides these alleged instances of notice, Harelson/ANPAC also allege that Halmekangas had two appraisals of the property after the policy was written and before the loss that both produced property values within the policy limits. As such, Harelson/ANPAC assert that Halmekangas's claims are perempted because he knew or should have known that the property description in his policy was the basis for his policy limits.

Finally, and with specific regard to the claims against Harelson for breach of duty as Halmekangas's insurance agent, Harelson argues that he had no duty under Louisiana law to advise Halmekangas as to whether he had sufficient or appropriate coverage. Rather, because he did not agree to any such duty, Harelson argues that his only duty was to use reasonable diligence to place the coverage specifically requested by Halmekangas, which he claims he fulfilled. Harelson argues that because he had no duty to advise Halmekangas regarding the

---

[5] The January and post-January 2005 mailings are evidenced by an affidavit of Kirby McKenzie, custodian of the underwriting records and underwriting file of ANPACLA. See Def. Memo Supp. Summ. J., Ex. 6. Halmekangas avers that he does not remember whether or not he received these documents, and reiterates that all his files were destroyed in the fire, making it impossible to verify receipt of the documents and thus precluding summary judgment on peremption grounds. Pl.'s Memo Opp. Summ. J., 10-11.

details of the insurance he sought, and especially in light of the fact that his only connection to Halmekangas was through an insurance broker, his only duty was to procure the specific coverage that Halmekangas sought.

In opposition, Halmekangas denies that the application he signed included a description of the property.  Furthermore, Halmekangas claims that there are substantial issues of material fact with regard to what he received from Harelson and ANPACLA, as well as when he received it.  Specifically, Halmekangas claims that most of his personal files, including any correspondence from Harelson and/or ANPACLA, were destroyed by the fire that consumed the property.  In addition, Halmekangas argues that the signed policy and declarations sheet that he produced during this litigation were copies that he received from Harelson and/or ANPACLA after Hurricane Katrina.

Additionally, Halmekangas argues that even if he did receive the declarations sheet prior to Katrina, the property description in the declarations was not sufficient to put him on notice because it does not facially appear to be important to the policy, and only indicates that it is intended to be an accurate description in fine print at the bottom.

Furthermore, Halmekangas claims that at the time the insurance was issued, renovations had been completed on the

9

second and third stories of the house, which consisted of 3400 square feet of living space, but that renovations on the first floor were ongoing.  As such, Halmekangas argues that even if he read and relied on the property description, he may have thought that the description was correct given the ongoing renovations.  Halmekangas bolsters this argument by noting that he allegedly spoke with Harelson at several intervals after issuance of the policy, and was assured the coverage was sufficient.  In addition, Halmekangas notes that he attempted to increase his coverage limits, but was denied because Harelson indicated an increase would render him over-insured.  Halmekangas contends that the over-insurance was simply a result of Harelson's initially erroneous property description in the initial placement of insurance.

    Finally, Halmekangas notes that the property description generated by ANPACLA *after* Hurricane Katrina clearly and prominently indicates that the description will be used to calculate policy limits.  Halmekangas notes this fact to suggest that the pre-Katrina description was inadequate to put him on notice that the description was binding on him as it related to the limits of his policy.

## DISCUSSION

**A.   Summary Judgment**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (citing Fed. R. Civ. Proc. 56©).  The moving party bears the initial burden of demonstrating to the court that there is an absence of genuine factual issues. Id. Once the moving party meets that burden, the non-moving party must go beyond the pleadings and designate facts showing that there is a genuine issue of material fact in dispute. Id.  "A factual dispute is 'genuine' where a reasonable jury could return a verdict for the non-moving party. If the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial and summary judgment is proper." Weber v. Roadway Exp., Inc., 199 F.3d 270, 272 (5th Cir. 2000) (citations omitted). The non-moving party's burden "is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. [The courts] resolve factual

controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. *[The courts] do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts.*" Little, 37 F.3d 1075 (emphasis in original)(citations omitted).

### B.   **Louisiana Revised Statute § 9:5606**

Louisiana law provides a one year peremptive period for claims against insurance agents and brokers arising from the process of procuring insurance coverage:

> No action for damages against any insurance agent, broker, solicitor, or other similar licensee under this state, whether based upon tort, or breach of contract, or otherwise, arising out of an engagement to provide insurance services shall be brought unless filed in a court of competent jurisdiction and proper venue within one year from the date of the alleged act, omission, or neglect, or within one year from the date that the alleged act, omission, or neglect is discovered or should have been discovered.

La. Rev. Stat. Ann. §9:5606(A).  In connection with this peremptive period, "Louisiana law imposes a duty on the insured to read and know his or her insurance policy provisions." Campbell v. Stone Ins., Inc., 509 F.3d 665, 671 (5th Cir. 2007). As this Court has previously noted, alleged errors regarding property descriptions in a insurance policy can constitute an "act, omission, or neglect" under §9:5606.  See Ricca v. State

Farm Fire & Cas. Co., 2008 WL 2906528, *3 (E.D. La. 2008). However, when an insured is "lulled into complacency by representations made by" an insurance agent, the insured's "reliance [may be] well-founded, regardless of the actual language of the policy," and the insured may be "excused from . . . failure to discover the problem earlier." Fidelity Homestead Ass'n v. Hanover Ins. Co.,458 F. Supp.2d 276, 280-81 (E.D. La. 2006).  Despite the possibility of an insured's reliance on his agent's actions, "Louisiana law does not impose a duty upon an insurance agent to spontaneously identify a client's needs and advise him whether he is underinsured or carries the correct type of insurance." See Dobson v. Allstate Insurance Co., 2006 WL 2078423 (E.D. La. 2006).  In order for an insured to state a cause of action for breach of duty in procuring insurance, the insured must show: "(1) an undertaking or agreement by the agent to procure insurance; (2) failure of the agent to use reasonable diligence in attempting to place the insurance and failure to notify the client promptly if he has failed to obtain the insurance; (3) actions by the agent warranting the client's assumption that he is properly insured." Webre v. Allstate Ins. Co., 2008 WL 2230061, *2 (E.D. La. 2008).  As such, generally speaking "[p]laintiffs [are] in a far better position than [the agent] to know that their property [is] worth more than the

13

coverage limits they selected" in applying for insurance.  Id.

Under §9:5606, Halmekangas's claims against Harelson/ANPAC are perempted.  First, the crux of this case is whether Halmekangas received the policy and declarations with the allegedly erroneous property description before the loss occurred.  Halmekangas's argument that there is insufficient proof that he actually received these documents prior to Hurricane Katrina is unpersuasive.  While there may be a technical issue of fact as to the specific documents Halmekangas received on January 5, 2005, no rational finder of fact, based on the evidence in this summary judgment record, could find that Halmekangas did not have the policy and declarations sheet including, the alleged incorrect property description, prior to the storm.  While Halmekangas claims that his original copies of the pertinent documents were destroyed in the fire, and while he claimed at deposition that the only documents he could say he had with certainty prior to the storm were the ones with his handwriting (i.e. not the pages that included the property description), the summary judgment record belies these claims.  First, it borders on the irrational to assume that Halmekangas did in fact have the first page of the declaration sheet prior to the storm, as evidenced by his handwritten notes on that page, but did not contemporaneously have in his possession the

sequentially numbered pages of the declaration sheet that did contain the allegedly erroneous description.

Further, while Halmekangas was equivocal at his deposition regarding whether or not he received documents that included the allegedly incorrect property description prior to Hurricane Katrina, *he has never expressly denied receiving such documents prior to the storm*. As such, Halmekangas has not met his burden as the non-movant in this motion for summary judgment to "designate *facts* showing that there is a genuine issue of material fact in dispute" beyond his mere "'conclusory allegations,' [and] 'unsubstantiated assertions'" that he did not receive the relevant documents. <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075.

Finally, Halmekangas's own responses during discovery contradict his claims that he never received the policy and declarations sheet prior to the storm. See Def.'s Reply Memo Supp. Summ. J., Exs. 15 & 16. Halmekangas, in response to interrogatories regarding whether he received and reviewed the policy and declarations, indicated that he did receive them in January and March of 2005:

> I reviewed the policy when I first received it, approximately Jan. 05. I have no clear memory pertaining to the details of said review. I reviewed the policy again after receiving the initial change in policy from [ANPACLA] [from single to multifamily] to

>     verify that it was indeed listed as a single family
>     dwelling.

Def.'s Reply Memo Supp. Summ. J., Ex. 16.  While Halmekangas indicates that he does not remember the contents of the policy and declarations page he reviewed in January of 2005, this response does indicate that he received and reviewed the policy at that time.  In addition, the sworn affidavit of ANPACLA's custodian of the underwriting records and underwriting file shows that the policy and declarations sheet, *including the allegedly erroneous property description*, were all mailed on January 3, 2005, as well as several times afterwards, and all more than one year prior to the filing of the instant suit.  This affidavit, combined with Halmekangas's failure to expressly deny receipt of the pertinent documents and his equivocal assertions regarding whether and when he received them, all show a lack of any material issue of fact as to whether Halmekangas *knew or should have known* of the allegedly erroneous description more than a year prior to his filing suit on July 25, 2006.  As such, Harelson/ANPAC's motion for summary judgment should be granted.

This case is similar to the facts that were before this Court in Ricca.  2008 WL 2906528.  The plaintiff in Ricca claimed that the defendant flood insurer's agent originally characterized his home as a two-story, non-elevated, single family dwelling

16

prior to Hurricane Katrina, but then the insurer changed the description to an elevated, one story single family dwelling after the storm.  Id. at * 1 n.1.  This Court found that the relevant "act" for purposes of § 9:5606 occurred in mid-2006 when the home description was changed.  Id. at *3.  However, because that act occurred more than a year prior to the filing of plaintiff's suit, the claim was perempted.  Id.

Similarly, the allegedly erroneous description of the property occurred in January of 2005 when Harelson submitted the allegedly incorrect ITV to ANPACLA for underwriting.[6]  Thus, the fact that the property description in Ricca was found to be relevant in terms of §9:5606 defeats Halmekangas's argument that the property description in the policy and declarations sheet was too obscure or otherwise inconspicuous to put him on notice of the alleged errors.  As such, Halmekangas's claims are perempted because he knew or should have known about the alleged error in his property description more than one year prior to the filing of his suit.

In addition, and assuming he did receive the description

---

[6] Although another error occurred in March of 2005 with regard to whether the property was a single or multiple family dwelling, that error was corrected and is not in dispute in this case.  The only relevant alleged error at issue is the initial description of the property by Harelson.

prior to his loss, Halmekangas argues that the 3400 square foot description that Harelson and ANPACLA claim as the basis for their motion may have appeared correct to Halmekangas at the time because the house was under renovation.  Halmekangas relies on this argument to suggest that he did not and should not have known the description was incorrect.  Halmekangas argues further that he described the property to Harelson on multiple occasions, and even attempted to procure additional insurance on the property, all of which suggests that he had no reason to believe that the property was underinsured based on the allegedly incorrect description.  To the contrary, these renovations should have prompted Halmekangas to inquire about the discrepancies between the property description in his policy and declarations sheets and the actual nature of the house.  Thus Halmekangas's argument based on the ongoing renovations actually supports the position that he knew or should have known prior to Hurricane Katrina that the allegedly erroneous description was incorrect.  This result is even further bolstered by the fact that appraisals *obtained by Halmekangas* in March and June of 2005 both show the pre-Katrina replacement cost of the property to be within the policy limits of the ANPACLA policy.  See Def. Reply Memo Supp. Summ. J., 7 & Exs. 13 & 14.  Finally, the fact that Halmekangas specifically applied for coverage in the amounts denominated in

the ANPACLA insurance application suggests that he knew or should have known whether those amounts were adequate to cover the property, either under the description espoused by Harelson/ANPAC or the three-story, 5500 square foot description that he contends he gave to Harelson.  Accordingly,

**IT IS ORDERED** that the Motion for Summary Judgment (Rec. Doc. 106) filed by Defendants Harelson and ANPAC, in its capacity as Harelson's errors and omissions insurer, is **GRANTED.**

New Orleans, Louisiana, this 21st day of November, 200.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE